24-9508 Moundih v. Garland. Mr. July, are you ready to proceed? Good morning, Your Honors. My name is Douglas July. I am Petitioner's Counsel during pro court. Your Honors, this case holistically regards substantial evidence and whether the judges at the Board of Immigration Appeals conclusions were supported by substantial evidence. We also have an argument for abuse of discretion on whether there was intentional ignorance of evidence or certain facts that were ignored. But our primary argument is substantial evidence. Regarding the first, I'm sorry, I'd like to reserve five minutes for rebuttal. We'll see how that works. It doesn't always work out that way. Just saying. Thank you, Your Honor. The first issue that we draw attention to in the briefing is the country conditions. And I think the 2022 Tenth Circuit case regarding a Cameroonian national highlights the difference between the way the Tenth Circuit interprets the situation in Cameroon and the way the Board of Immigration Appeals, and the immigration judge as well, interpreted the situation, the political situation in Cameroon. And I don't think, not only was it just I think unfair, but more importantly, it was not supported by substantial evidence to characterize what's happening in Cameroon as garden variety civil unrest or quote-unquote some civil unrest or civil strife. That rings of a tone that seems to be sweeping the matter under the rug. There's human rights atrocities happening in Cameroon, and I think if the board is characterizing it as your garden variety civil unrest, maybe there were protests around an election time and it's done now or it's garden variety. That's not what's happening. This has been ongoing since the current regime has been in power. Anybody who politically dissents is kidnapped, tortured, their family is also tortured. The country conditions and the Tenth Circuit's own published case law shows that in detail. So I don't think it was, I think that was a mistake. I think that's reversible error to characterize, first off, characterize the situation as some civil unrest. And that dovetails into the second argument that was not supported by, that the board's decision was not supported by substantial evidence, which is that the petitioner's sister was not, on the whole, subject to torture. We know that she was subject to untold, quote unquote, untold inhumane treatment, detained for 10 days. She was subject to threats, beating, and torture. We also have... Was that described in any detail? That's her conclusion. Unfortunately, we did not have more detail than that, but we did have a medical record that showed chest trauma and two days of hospitalization after her 10 days in police detention. And that's why that first part regarding the country conditions is so critical, because this evidence coexists with the country conditions. Was there a question as far as country conditions, whether it was across the entire country? In other words, there were places to relocate where that would not be an issue? If we look at our own Department of State report, it shows that the issue is pervasive throughout the country. And in addition, internal relocation was not an issue that was raised below. It was not a reason for the denial. And so I would argue that it isn't an issue that's at contest here. But I think if we look at, in the country conditions, we look at our own Department of State report, which is always the North Star of these cases, we'll see that it's a pervasive issue throughout the country. The third issue is petitioners' own political activism and his own being targeted by the authorities. And the board stated that, well, the immigration judge and the board relied on the immigration judge's statement that the petitioners limited political activism is, and I'm quoting, is not for the court to find that it would be more likely than not that he is in a similar position as other citizens of Cameroon who have returned to Cameroon and have been subjected for some sort of harm there. And I think we're, again, where the board and the immigration judge miss here was seen in the backdrop of this unforgiving regime. I mean, they're going after any political dissenters. Let me ask you, where do you discuss this in your brief? I just searched your brief for the word unrest, and it appears once in your brief. And did you go through this and explain that all anyone who objected politically to the regime was being tortured and kidnapped? Is that in your brief, in your brief? Yes, Your Honor. One moment. I'm using strife and unrest interchangeably. And the first issue I raise is the immigration judge's statement that the board relies on that Cameroon is going through, quote, some civil strife. And then I thought the court's opinion, this court's opinion in Gonzalo Zagular v. Garland is just so instructive. And I quoted right out of that opinion because it's just so directly on point for the situation in Cameroon. Of course, the hundreds of pages of country conditions support what I'm saying. But the Tenth Circuit, in its own opinion, details that very well and eloquently. And so I'm relying on that. And the board did not say some civil strife. They said garden variety civil strife. And I just didn't think that was fair. Petitioner. One key. So my third argument, which is Part C of my brief, petitioners, quote, unquote, limited political activism. This issue that, well, the petitioner was not active enough in the political realm to be targeted by the government of Cameroon. But the key fact that is not mentioned by the immigration judge or the board at all is that on his phone or excuse me, on the sister's phone. When they confiscated the sister's phone, they found messages from her brother, who is the petitioner, regarding this political activism. And that, quite frankly, I feel like it was just ignored. And I do understand that the IJ and the board. Yes, Your Honor. And I do know that the case law and I cite from our Ninth Circuit that the board and the immigration judge, they don't have to write an exegesis on every piece of evidence. But I do believe this was a critical point of identifying him. Even what even if he's not the most politically active person, he's still been identified and that dissidence has been imputed upon him. And when he shows up. Do we have a record? Does the record show exactly what those messages on her phone were? And does it show that the government did consider him a political opponent as a result? In response to Your Honor's first question, we do not have the messages themselves. We just have her statement. We have her statement that they took her phone and they were asking, questioning her about. And they questioned her about her brother? Yeah, correct. And also his own testimony that, and we're not in hearsay, we're under fundamental fairness evidence, so it can be considered his own testimony that that's what his sister told him. In response to the court's second question, this is critical because if we look at the Tenth Circuit's decision and my quote from that decision in Gonzales-Aguilar v. Garland, in that case, there was a lot of evidence about ICE deportees having their, being identified at the airport by a dragnet. In Cameroon. In Cameroon. And so again, that recent 2022 published case is very instructive as to what happens to somebody like Petitioner who can be. And this is just more likely than not. It's a 50% chance. It's not beyond a reasonable doubt. It's an odd situation in the law where he has been returned to Cameroon. And so when we talk about likelihood and possibilities, it's either happened or it hasn't. And I know that that doesn't moot your case, but if in fact he was returned when? It's been a while. 2005. And so in that intervening time, if there hasn't been torture, he would, if we were to, or if the board were ultimately to grant him cat relief, would he arrive back in America and get on a plane back for Cameroon? He would be returned, yes. Speaking from personal experience, he would be returned. All right. But we don't have any information on whether he was tortured after being returned. Your Honor, in regards to 2005 or? No, I thought that he had been removed. He took a voluntary trip back to Cameroon. That was in 2005, yes. But then he was removed. He has been removed, yes. And we don't have any further evidence. That would be the subject of a motion to reopen. But the motion to reopen deadline has run, and as the Respondent Counsel notified the court that there was a motion to reopen that was denied. But again, I don't think that's before the court. Even if, let's say he was tortured, how would I get that evidence before the court? So with respect to the 2005 trip, was that after his sister's phone had been seized? No, no, no, no. And the last point, which I'll just briefly touch on, this is the situation with Colonel Bamcoui and the affair with Colonel Bamcoui's mistress, and this vendetta that Colonel Bamcoui has against the petitioner. That relates back, I would say that is in play for when he went back, and there was this warrant for his arrest. That's my last argument, is that the warrant was presumed to be valid, and I thought that was unfairly characterized and make the same arguments on substantial evidence. So as I understand your argument, it's that he's been revealed as a political opponent of the regime through his sister's phone. The country reports say that political opponents are systematically tortured, and his sister was tortured. And therefore, we should expect or one should make a finding that there's a likelihood of his being tortured if he's returned to Cameroon. More likely than not. Now, one step in that is his sister's torture, but didn't the BIA and the IJ find that she was not tortured and that that was not challenged in your brief here? No, what they found was that the withholding of removal eligibility was not challenged, and that was waived. Regarding the sister's torture, we did challenge that, and the board again found that. But the board found that she was not tortured, is that right? That's correct, the IJ and the board. Okay, and do you challenge that in your brief in this court? Yes, I do. That's it, subsection B of my, it's labeled threats to petitioner's sister, but the argument is that they should have found that she was tortured. Under substantial evidence standard. Correct. Which means we had to be compelled to believe that the board got her wrong. Yes. So it's not just a what do you think, do you agree or disagree, it's a much tougher standard. This was in the context that her statements were not challenged before the immigration judge. She was on the witness list to testify, but we did not solicit her testimony because DHS did not challenge her testimony. My time is up. I thank the court for the time. Thank you. Sincerely. And thank you. Mr. Spurlock. Good morning, may it please the court. Matthew Spurlock on behalf of the United States. I'd like to start out with what were the two bases that the immigration judge and the IJ found that he was not eligible, he was not more than likely than not to be tortured if he's returned to Cameroon. There were two bases that he provided for why he believed he would be tortured. Number one, he had this old relationship that involved a colonel in Cameroon that maybe had a relationship with the mother of his child and that this colonel still had it out for the petitioner. And years later he would seek him out and try and kill him or torture him or whatever. That was the first basis for why he feared going back to Cameroon. The other basis for why he feared going back to Cameroon was that there was an incident where his sister, who is involved in political, I guess, political protests in Cameroon, was recording videos of police brutality. And she was detained and beat by the police. And when they detained her, they looked at her phone and there was a video from petitioner that was on her phone. And the Cameroonian officials or police or whoever got her phone confronted her about this. And she said, well, that's from my brother, I suppose. And so that's the entire basis for what his fear of being tortured is. Well, the country conditions. I'll get to that in just a minute, Your Honor. But you don't think he argued that? I think he argued it, but I think it's important to look at what those basis were for what his claim of fear of torture was. It was not. It was not that he was anything like the people that are listed in the country conditions and all of the articles that are in the record about people who, when they returned, were immediately detained and suffered various forms of persecution. He has nothing in common with those people. Most of those individuals that were highlighted in all of those submissions in the record don't have anything to do with him. And the board and the immigration judge found this specifically. What they said was that his level of political activism or participation is nothing like these other people. And that's backed up by his own testimony. He was asked during his testimony, do you go out in the streets and protest? He said, no, I'm not political. What I do is I'm a member of Code USA, which is some organization that is in favor of human rights in Cameroon. That's what he said. But I get money, I post stuff, and I support them. That's what he said. But when he was asked further, what is the nature of that organization? Where are they headquartered? He had no evidence of any of this. And he had no evidence of any payments that he'd ever made to the organization. So his level of activism is limited to basically sending videos that his sister got a hold of. And it's also very important, when the sister got a hold of the video, the extent of the government in Cameroon's interest in Petitioner, when they got that cell phone, was to look at the cell phone and say, oh, tell your brother to stop sending me these videos. That's it. There's no follow-up interrogations of the sister. Where is your brother located? There's no follow-up interest in his whereabouts at all. There's none of that evidence. And that would all be crucial evidence if you were going to try and show that it's more likely than not that the government of Cameroon is still interested in Petitioner after all these years. And I do think it does kind of go back to the argument about the country conditions in that Petitioner is arguing Gonzalo's Aguilar. That's talking about ignoring country conditions evidence, ignoring the evidence. The immigration judge of the board didn't ignore evidence here. They grappled with this evidence. They discussed this evidence. It's kind of hard to tell exactly, because the immigration judge sort of bifurcates their decision, because the immigration judge was initially interested in both if this case went to asylum or withholding, if it wasn't just a cat deferral case. So some of their analysis of that is in the withholding section for whether or not he met the requirements for persecution. But they grappled with that evidence. And they say after reviewing over 591 pages of this evidence, he does not look like any of these people that are facing all these different types of circumstances. Petitioner has never testified, and there's never any evidence, that he's at all involved in the major conflict that's going on in Cameroon, which is a separatist conflict between the Francophones in the southwest and the northwest against, I'm sorry, that would be the Anglophones, against the Francophones in the rest of the country. There's essentially an ongoing battle that's been going on for years in Cameroon. He hasn't talked about being a member or a part of that at all in any way, shape, or form. And that's in contrast to this court's decision. And I believe the name of the case is Takwe, which is in both of our briefs. They relied on it. And that's an excellent description of exactly what I'm talking about, which is that in Takwe, that individual, that petitioner, who was fearful of going back to Cameroon, was active in the, I believe, the southern Cameroonian political movement. He was a member of that. We don't get any of that from this petitioner whatsoever. So just to, and one more point also about the, I wanted to also talk about the evidence that the petitioner just mentioned that he's concerned about with whether or not the sister was tortured or not, whether her attack by the Cameroonian authorities, whether that amounted to torture. I would just argue that both the immigration judge and the board considered the evidence that she provided that was in Exhibit 11 of the record, which were the letters from the attorney, from the sister, and I believe also there was medical, there was a medical document in there as well, and they considered that evidence and determined very clearly that that, the evidence of what they had she experienced did not rise to the level of torture. And I would argue substantial evidence would support that finding as well. And to further support that, if you look at the sister's own language in her letter, that's on AR 226, she just talks about she was threatened, she was humiliated, she was detained, and she says she was assaulted. But even those, as horrible as those things are in our view of how police interact with their own citizens, but that doesn't necessarily meet the definition of torture. It doesn't necessarily rise to the level of torture. And she was detained for, I believe, over a week or something like that. But based on that evidence, the court, I mean, the immigration judge and the board made the determination that what she experienced did not rise to the level of torture. Do you concede that he challenged that on appeal, the finding that she was not tortured? I believe he did, I think he did argue, I think he argued in the context of they did not consider the evidence. And that's a repeating theme in the entire position of the petitioner, is that they didn't consider the evidence, but there's overwhelming indications in the board and the immigration judge's decision that they considered the evidence. He's just quarreling with the result that they came to. And the standard is substantial evidence, and he has not presented anything that would compel a reasonable fact finder to find differently than what the agency did in this case. I'll just quickly talk a little bit more about the issue with the colonel. He also said that the immigration judge was engaged in speculation that the warrant that was out for his arrest in 2014, after he had returned from departing Cameroon, that that warrant was for legitimate purposes. Like the immigration judge said, for all we know, that warrant was for legitimate purposes. And that's that argument. But the reality is that that entire claim is based on speculation. He's never had any contact with this colonel in Cameroon. He's never had any communications from this colonel in Cameroon, never been threatened by the colonel, or anybody acting on behalf of the colonel. This never happened. All he knows is what the mother of his child told him. Oh, I had a relationship with this colonel. You better be careful. He's going to come get you. That's it. That's all we have. And the fact that when he returned, he was able to rent an apartment. He lived in Cameroon for some period of time. And during that time, supposedly a neighbor saw police come to the house and said, oh, there's people looking for you. They had a warrant. But there's never been a production of a warrant. We've never seen a warrant. We don't know what the warrant's for. We have no idea if that warrant has anything, if it exists, has anything to do with this colonel, who supposedly has a personal gripe against this petitioner years and years and years later. And there's no evidence of it. It's one speculation after another. And that's not enough to meet his burden of proof for cat protection at all. I just also wanted to briefly talk about, go back to the country conditions evidence, as well as what he just mentioned, his status as a returnee to Cameroon. And there's evidence that a lot of these people who are returning from the United States are being picked out and tortured or abused or persecuted by the Cameroonian government. And I would argue that, first of all, going back to what I said at the very beginning, that was never a basis for his fear of going back to Cameroon. It was never, I'm a returnee, I'm a deportee. That's frequently a claim that people make. Deportees from the United States who go to a certain country are immediately picked up and told, oh, we're going to go through your papers, we're going to figure out who you are. He never made that claim. He never testified to that. He never put that in a statement. That's simply, oh, but look at our evidence here that says that this has happened to a lot of people. But I would argue that the immigration judge covered that because they said he is not similarly situated to any of those people that were listed in those articles. It's completely different. So based on that, I think that substantial evidence supports the agency's decision in this case, and I believe the court should leave that decision unstirred. Thank you, counsel. Thank you. I believe your time has expired. Is that correct? Can I ask for 30 seconds, Your Honor? No more. You got it. Thank you. 30 seconds, Your Honor. Thank you, Your Honors. I really encourage the panel to really look at the board's decision. In their decision, they leave out a key fact. Nowhere in the immigration judge's decision or the board's decision does it acknowledge or consider that they went through the sister's phone and identified the brother. That's number one. Number two, nowhere in those decisions is there any citation to country conditions evidence. They say they went through it, but there's no citations. They don't discuss any of the country conditions. Thank you so much. Thank you, counsel. Case is submitted.